UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODNEY GOSS,

      Petitioner,

                                CASE NO. 2:09-CV-14485
v.                           JUDGE ROBERT H. CLELAND
                                MAGISTRATE JUDGE PAUL J. KOMIVES

SHERRY BURT,

      Respondent.[1]
_____/

**REPORT AND RECOMMENDATION**

*Table of Contents*

I.     RECOMMENDATION .................................................... 1
II.    REPORT ............................................................ 1
      A.    *Procedural History* ............................................. 2
      B.    *Factual Background Underlying Petitioner's Conviction* ............... 3
      C.    *Standard of Review* ............................................. 7
      D.    *Waiver of Preliminary Examination (Claim I)* ........................ 9
      E.    *Sentencing (Claim II)* .......................................... 11
      F.    *Sufficiency of the Evidence (Claim III)* ........................... 12
          1.     Clearly Established Law ................................... 12
          2.     Analysis ................................................ 14
      G.    *Ineffective Assistance of Counsel (Claim IV)* ....................... 15
      H.    *Recommendation Regarding Certificate of Appealability* .............. 16
          1.     Legal Standard ........................................... 16
          2.     Analysis ................................................ 17
      I.    *Conclusion* .................................................. 18
III.   NOTICE TO PARTIES REGARDING OBJECTIONS ....................... 18

\*     \*     \*     \*     \*

I.     RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.    REPORT:

---

    [1] By Order entered this date, Sherry Burt has been substituted in place of Debra L. Scutt as the proper respondent in this action.

A.   *Procedural History*

1.   Petitioner Rodney Goss is a state prisoner, currently confined at the Muskegon Correctional Facility in Muskegon, Michigan.

2.   On March 8, 2007, petitioner was convicted of three counts of second degree murder, MICH. COMP. LAWS § 750.317; and one count of second degree fleeing and eluding, MICH. COMP. LAWS § 750.479a(4), following a bench trial in the Wayne County Circuit Court.  On March 22, 2007, he was sentenced to concurrent terms of 50-80 years' imprisonment on each of the murder convictions, and 6-10 years' imprisonment on the fleeing conviction.

3.   Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

   I.   DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN HIS ORIGINAL TRIAL ATTORNEY ALLOWED HIM TO WAIVE HIS RIGHT TO A PRELIMINARY EXAMINATION WHEN HE WAS HEAVILY MEDICATED AND THE TRIAL COURT DENIED DEFENDANT'S MOTION FOR A PRELIMINARY EXAMINATION.

   II.   DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED WHERE THE TRIAL COURT USED DEFENDANT'S SENTENCE TO SEND A MESSAGE TO THE COMMUNITY.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Goss*, No. 277142, 2008 WL 2597092 (Mich. Ct. App. July 1, 2008) (per curiam).

4.   Petitioner sought leave to appeal these issues to the Michigan Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Goss*, 482 Mich. 1186, 758 N.W.2d 560 (2008).

5.   On November 17, 2009, petitioner filed an application for the writ of habeas corpus in this Court, raising the two claims he raised in the state courts.  Petitioner also indicated in his

application that he intended to file a motion for relief from judgment in the trial court raising additional claims, and requested that the Court hold his petition in abeyance pending the state courts' resolution of that motion. On April 28, 2010, the Court entered an Order staying the case.

6. Meanwhile, petitioner had filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

> I. EVIDENCE ADDUCED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE CRIME OF MURDER IN THE SECOND DEGREE.
>
> II. DEFENDANT WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON HIS ONLY APPEAL OF RIGHT WHEN SHE OMITTED THE ISSUE NOW RAISED.

On April 16, 2010, the trial court denied petitioner's motion for relief from judgment, finding his claims to be without merit. *See People v. Goss*, No. 06-013512 (Wayne County, Mich., Cir. Ct. Apr. 16, 2010) [hereinafter "Trial Ct. op."]. The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Goss*, 488 Mich. 1045, 794 N.W.2d 592 (2011); *People v. Goss*, No. 298744 (Mich. Ct. App. July 26, 2010).

7. On May 2, 2011, petitioner filed a motion to lift the stay and an amended petition adding the two claims that he raised in his motion for relief from judgment. On August 4, 2011, the Court granted petitioner's motion to lift the stay and reopened the case.

8. Respondent filed her answer on January 31, 2012. She contends that petitioner's claims are without merit or not cognizable on habeas review.

B. *Factual Background Underlying Petitioner's Conviction*

Petitioner's convictions arise from a high speed chase that ended when he crashed into another vehicle, killing the three occupants. The evidence adduced at trial was accurately summarized in the prosecutor's brief in the Michigan Court of Appeals on direct appeal:

>   Michigan State Police Trooper Samuel Lentine testified that on November 10, 2006, at around 8:30 or 9:00 p.m., he was on duty with his partner, Trooper Matthew Keller. They were working on a special detail, Project Safe Neighborhoods, in northwest Detroit, in conjunction with the Detroit Task Force, ATF, and the FBI. Their normal duties were traffic patrol on the highways. On this date, their main function was also general patrol and making traffic stops.
>   At around 8:30 or 8:45 p.m., he observed a vehicle, a red Jeep, traveling at a high rate of speed on northbound M-39 (Southfield). The Jeep then made an eastbound turn onto Seven Mile, squealing its tires in the process. He followed the Jeep in an attempt to catch up to it and was only able to do so after about a mile. While he was following the Jeep, he did not have his lights or siren on; he was simply trying to catch up to it to see what was going on. When he got to within a car length or two of the Jeep, however, he did activate his patrol car lights. His patrol vehicle was such that when he activated his lights, the vehicle's in-car video camera, which faced out the windshield, would come on. He had checked his vehicle's video camera system before going on patrol that day and found it to be in working order.
>   After he turned his patrol car lights on, the Jeep accelerated and made a southbound turn onto Sussex Street from Seven Mile. As he turned southbound onto Sussex, he turned on his siren as well. The Jeep continued southbound on Sussex for a couple of blocks. Sussex was a residential street where the speed limit was 25 miles per hour, but he had to go about 50 miles per hour to keep up with the Jeep. After going a few blocks on Sussex, the Jeep then turned westbound onto another street, and in the process, the driver lost control of the Jeep and ended up going over a curb and onto the grass where he then regained control and continued traveling westbound. As the Jeep continued westbound, it went for four or five blocks at the same speed and went through multiple stop signs without stopping at any of them. Meanwhile, he was five or six car lengths behind the Jeep. The Jeep then made a northbound turn onto Rutherford Street, where the Jeep went several blocks. Rutherford was also a residential street with a 25 mile per hour speed limit. He continued to follow the Jeep at a speed of about 50 miles per hour with his lights and siren still activated. There were traffic devices along Rutherford, but the Jeep disregarded them, making no attempt to stop. There were also other vehicles out there, but he did not recall what they did during the chase because he was concentrating on the Jeep. The Jeep then made a turn onto eastbound Clarita, another residential street, and it proceeded four or five blocks on this street, traveling about 50 miles per hour. There were also stop signs on Clarita. When the Jeep came to Greenfield, it made a southbound turn and went about two miles. They were finally able to catch up to the Jeep after it crashed. They were about a half mile from

the Jeep when it crashed.

When he and his partner came upon the Jeep, Defendant was in the vehicle. He himself went to the passenger side of the vehicle and his partner went to the driver's side. They could not get the Jeep's doors open, so he ended up breaking out the passenger side window. There was a female passenger in the seat.

The witness was asked if he ever hit the Jeep in order to disable it. He responded that he did not because that maneuver required special training. If he were to have attempted that, he would have been disciplined in some fashion.

As the scene of the crash, he also inspected the vehicle that the Jeep had hit. There was heavy damage to this vehicle on the driver's side. There were two black males in the front seat of the vehicle, in the driver's seat and passenger seat, and there was a third black male lying on the ground on the side of the impact. He was not able to determine the conditions of these people, but an ambulance did arrive and the people were taken to a hospital.

On cross-examination, Trooper Lentine testified that at some point, Defendant was transported to a hospital for purposes of a blood draw. Although he was not at the hospital himself for the blood draw, he was aware that the blood draw was negative for alcohol in Defendant's system.

On redirect examination, Trooper Lentine testified that when he came upon the Jeep after it hit the other vehicle, he saw Defendant in the driver's seat.

Michigan State Police Trooper Matthew Keller testified that he was Trooper Lentine's partner on November 10, 2006. They were on road patrol in northwest Detroit in a fully marked patrol car and both were in uniform.

At around 8:30 or 9:00 p.m., he observed a vehicle approach the intersection of northbound M39 service drive and Seven Mile at a high rate of speed. The vehicle then made an eastbound turn, squealing its tires in the process. The vehicle then continued eastbound, traveling in and out of traffic at about 45 miles per hour. His partner was driving the vehicle, and he (the witness), as the passenger, was in charge of the radio. He let his dispatch know what was happening and their location. He also let dispatch know that this was a priority run, meaning that all other radio traffic should cease and that they were in control of the airwaves. His partner, as the driver, was in charge of the patrol car's lights and siren. As they were following the vehicle, his partner activated the lights at the intersection of eastbound Seven Mile just before Sussex. When his partner activated the lights, the vehicle they were following then made a right hand turn onto southbound Sussex and accelerated instead of stopping. Sussex was a residential street, where the speed limit was 25 miles per hour. He did not recall the speed that his partner drove to keep up with the vehicle, but it was in excess of 25 miles per hour. When the vehicle came to Pickford, it went westbound onto Pickford and continued at a high rate of speed. The vehicle then turned northbound onto Rutherford and went a few blocks until it came to Clarita, where it turned eastbound. The vehicle then turned onto Greenfield and went southbound. Greenfield was a commercial zone with a speed limit of 35 miles per hour. They were still unable to catch up to the vehicle at this point. When the vehicle got to McNichols on Greenfield, it struck a small, four-door passenger car with three

5

people in it. He approached the vehicle that they had been chasing and saw a male in the driver's seat and a female in the passenger's seat. He identified Defendant in court as the driver.

On cross-examination, Trooper Keller testified that they did not immediately pursue the vehicle when they observed it because they were probably at an intersection and waiting for traffic to clear. Also on cross, Trooper Keller testified that they did not bump the vehicle in order to get it to stop. In fact, they were not allowed to do that unless they were trained to do that.

Michigan State Police Sergeant Kevin Lucidi testified that he was a traffic crash reconstructionist and had been for four years. He had received several hundred hours of training for this specialty. He had investigated over two hundred accidents in this capacity and had testified as an accident reconstructionist in about 15 cases and had been declared an expert in this field.

On November 10, 2006, he was asked to come to the scene of an accident at Greenfield near McNichols. He determined that the proximate cause of the crash was the Jeep running the red light and entering the intersection against the right of way. He also determined that the speed range in which the Jeep was traveling when it entered the intersection was between 77 and 81 miles per hour, and, as far as the other vehicle, the one that the Jeep hit, that vehicle, a Mercedes, was traveling between 31 and 37 miles per hour. The actual impact between the vehicles took place in the left southbound lane of Greenfield and the left hand eastbound lane of McNichols. The Mercedes was traveling eastbound on McNichols when it was struck by the Jeep.

He inspected the Jeep at the scene of the crash and found no paint or other markings on the rear end of it. Nor did he see any damage to the front of the patrol car. The posted speed limit on Greenfield was 35 miles per hour as was the speed limit on McNichols. There was no indication that it had been raining at the time of the collision or that the pavement had been wet.

On cross-examination, Sgt. Lucidi testified that there was nothing from his inspection of the patrol vehicle that gave him reason to believe that the patrol vehicle ever struck the Jeep.

Ramona Higgins testified that she knew Defendant, identifying him in court.

She testified that she was with Defendant on November 10, 2006. They were going over to Defendant's sister's house. At around Seven Mile and Sussex, she noticed that the police were on them, with their lights on. That's when Defendant turned the corner and said to her, "Hold on." And that's when Defendant started driving at high speeds and turning corners. She started screaming for him to slow down. Then they crashed and she broke her toes.

On cross-examination, the witness was asked if she was aware of there being anything illegal in the vehicle, like drugs or guns; she responded that she was not. In other words, she was aware of no reason that Defendant would be trying to get away from the police. She was asked if she recalled their vehicle ever being hit; she responded that she did not. She did recall that as they were being pursued by the police, Defendant told her that the patrol car had hit their vehicle. She testified that

6

> she never saw any police lights until Defendant turned onto Sussex from Seven Mile.
>         Assistant Wayne County Medical Examiner Cheryl Loewe testified that she performed autopsies on the three victims: Eugene Pierce, Eric Flowers, and Brent Berry. Eugene Pierce was a 25 year old black male who died of multiple injuries sustained while he was a passenger in a motor vehicle collision. Eric Flowers was a 27 year old black male who died of multiple injuries sustained when he was ejected during a motor vehicle collision. And Brent Berry was a 23 year old black male who died of multiple injuries sustained in a motor vehicle.

Pl.-Appellee's Br. on Appeal, in *People v. Goss*, No. 277142 (Mich. Ct. App.), at 3-9 (citations to trial transcript omitted). Petitioner presented no witnesses. Counsel argued that petitioner failed to stop for the police because the police had collided with the rear of his car.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the

benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Waiver of Preliminary Examination (Claim I)*

Petitioner first contends that he was incompetent to waive his preliminary examination because he was under the influence of morphine at the time. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

There is no general constitutional right to a preliminary examination before trial. *See Gerstein v. Pugh*, 420 U.S. 103, 125 n.26 (1975); *Harris v. Neil*, 437 F.2d 63, 64 (6th Cir. 1971). Thus, a state court's failure to even hold a preliminary examination does not present a cognizable habeas claim. *See Scott v. Bock*, 241 F. Supp. 2d 780, 793 (E.D. Mich. 2003) (Lawson, J.). Further, it is an "established rule that illegal arrest or detention does not void a subsequent conviction." *Gerstein*, 420 U.S. at 119 (citing *Frisbie v. Collins*, 342 U.S. 519 (1952); *Ker v. Illinois*, 119 U.S. 436 (1886)). Thus, "although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." *Gerstein*, 420 U.S. at 119. Because

petitioner is now incarcerated pursuant to a valid conviction, he cannot challenge the preliminary procedures employed prior to his trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

Nor can petitioner show that his counsel was ineffective for allowing him to waive the preliminary examination, his claim is without merit. To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense in that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 689-95 (1984). It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993). Petitioner cannot meet that burden here. First, as the court of appeals explained, petitioner's "assertion that he was under the influence of morphine or other pain medication at the time he waived his right to a preliminary examination is unsubstantiated." *Goss*, 2008 WL 2597092, at *2. Second, petitioner cannot show a reasonable probability that, had he not waived a preliminary examination, the charges would have been dismissed. As explained below, there was ample evidence of petitioner's guilt presented at trial, and all of this evidence was available to the prosecution at the time the preliminary examination was waived. There is thus not a reasonable probability that the district court would have found a lack of probable cause following a preliminary examination. Accordingly, to the extent petitioner is attempting to raise an ineffective assistance claim related to the waiver of his preliminary examination, the claim is without merit.

E.  *Sentencing (Claim II)*

Petitioner next contends that his sentence was inappropriate, because it was not individualized and was imposed by the trial judge to "send a message." The court of appeals rejected this claim, noting that "[t]he deterrence of others is a proper objective of sentencing," that petitioner's "prior record of five felony and six misdemeanor convictions warranted lengthy sentences," and that petitioner's "minimum terms were within the guidelines." *Goss*, 2008 WL 2597092, at *2. This determination was neither contrary to, nor an unreasonable application of, clearly established federal law.

Although the Supreme Court has held that individualized sentencing is required in the death penalty context, *see, e.g.*, *Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), these cases "have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties." *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 110-112 (1982); *Rummel v. Estelle*, 445 U.S. 263, 272 (1980); *Lockett v. Ohio*, 438 U.S. 586, 602-05 (1978); *Woodson*, 428 U.S. at 303-05). Based on these cases, the *Harmelin* Court explicitly declined to extend the individualized sentencing requirement to non-capital cases. *Harmelin*, 501 U.S. at 996 ("We have drawn the line or required individualized sentencing at capital cases, and see no basis for extending it further."); *see also*, *id.* at 1006 (Kennedy, J., concurring).

Further, the trial court's desire to deter others is a permissible basis for sentencing. There are four generally recognized purposes of criminal sanctions, and imprisonment in particular: rehabilitation, deterrence, incapacitation, and retribution (*i.e.*, punishment). *See generally*, *United*

*States v. Brown*, 381 U.S. 437, 458 (1965); *Trop v. Dulles*, 356 U.S. 86, 111 (1958) (Brennan, J., concurring); Toni M. Massaro, *Shame, Culture, and American Criminal Law*, 89 MICH. L. REV. 1880, 1890 (1991). However, nothing in the Constitution requires a state to establish its system of criminal sanctions to give primacy to any one of these goals. *See Harmelin*, 501 U.S. at 999 (Kennedy, J.) ("[T]he Eighth Amendment does not mandate adoption of any one penological theory."). Thus, so long as the imprisonment is not cruel and unusual under the Eighth Amendment and does not violate some other constitutional guarantee such as the Equal Protection Clause, a state is free to impose imprisonment solely for the purpose of punishment. *Cf. Furman v. Georgia*, 408 U.S. 238, 308 (1972) (Stewart, J., concurring) ("The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.   *Sufficiency of the Evidence (Claim III)*

Petitioner next contends that the prosecution presented insufficient evidence to support his convictions for second degree murder. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

  1.   *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier

12

of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. "[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011) (per curiam). The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). Likewise, a reviewing court "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326. As the Court has explained, "the only question under *Jackson* is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. Under the amended version of § 2254(d)(1) a federal habeas court's review is "twice-deferential." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam). A state court's decision that the evidence satisfied the deferential *Jackson* standard is itself "entitled to considerable deference under AEDPA." *Coleman*, 132 S. Ct. at 2065; *see also*, *Cavazos*, 132 S. Ct. at 4.

While a challenge to the sufficiency of the evidence on an established element of an offense

raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 132 S. Ct. at 2064 (citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16).

    2.    *Analysis*

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *See People v. Goecke*, 457 Mich. 442, 464, 579 N.W.2d 868, 878 (1998); *People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Petitioner contends that the prosecution presented insufficient evidence of malice. As petitioner correctly notes, there was no evidence that he intended either to kill or to commit great bodily harm. Thus, the only issue at trial was the third form of malice. The trial court, the last state court to consider the issue on the merits, rejected petitioner's claim, concluding that the jury could

14

fairly infer based on the circumstances of the chase that petitioner intentionally acted in wilful disregard "to the possibility of causing great harm to those around him while he fled from police at a high rate of speed." Trial Ct. op., at 3. This determination was reasonable.

The evidence at trial established that petitioner drove at an excessive rate of speed through residential neighborhoods, running stop signs and ultimately a red light that resulted in the fatal crash. From this testimony, a rational jury could conclude that petitioner intended to create a very high risk of death or great bodily harm with knowledge that such was likely to result. *See People v. Goecke*, 457 Mich. 442, 471-72, 579 N.W.2d 868, 881-82 (1998), *habeas corpus denied sub nom. Hoskinson v. Bock*, 8 Fed. Appx. 558, 560-61 (6th Cir. 2001); *People v. Aldrich*, 246 Mich. App. 101, 123-24, 631 N.W.2d 67, 80 (2001), *habeas corpus denied sub nom. Aldrich v. Bock*, 327 F. Supp. 2d 743, 763 (E.D. Mich. 2004) (Cleland, J., adopting report of Majzoub, M.J.); *People v. Mayhew*, 236 Mich. App. 112, 125-26, 600 N.W.2d 370, 379 (1999); *see also*, *United States v. Sheffey*, 57 F.3d 1419, 1431 (6th Cir. 1995); *United States v. Fleming*, 739 F.2d 945, 948 (4th Cir. 1984). In light of the evidence regarding petitioner's conduct during the chase, it cannot be said that the jury's verdict was "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. It follows that the state court's rejection of this claim was reasonable, and petitioner is therefore not entitled to habeas relief on this claim.

G.      *Ineffective Assistance of Counsel (Claim IV)*

Finally, petitioner contends that his appellate counsel was ineffective for failing to raise his sufficiency of the evidence claim on direct appeal. As explained above, to establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2)

counsel's deficient performance prejudiced the defense in that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 689-95 (1984). In the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained above, petitioner's underlying sufficiency of the evidence claim is without merit, and thus petitioner cannot show that he was prejudiced by appellate counsel's failure to raise this claim on direct appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.    *Recommendation Regarding Certificate of Appealability*

   1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously

16

less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.    *Analysis*

Here, if the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability. It is beyond dispute that petitioner's preliminary examination and sentencing claims do not raise federal constitutional issues cognizable in a habeas corpus proceeding, and thus the resolution of these claims is not reasonably debatable. With respect to petitioner's sufficiency of the evidence claim, under the deferential *Jackson* standard petitioner's reckless driving at a high rate of speed and ignoring stop signs and red lights provided sufficient evidence for the jury to infer that petitioner acted with malice sufficient to support his convictions for second degree murder. Thus, the resolution of this claim is not reasonably debatable. Finally, because the resolution of the underlying sufficiency of the evidence claim is not reasonably debatable, it follows that the resolution of petitioner's related ineffective assistance of counsel claim is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a

waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 11/9/12

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and by electronic means or U.S. Mail on November 9, 2012.

s/Eddrey Butts
Case Manager